UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
XIOMARA Y. MORGAN,

                Plaintiff,

            - against -

CAROLYN W. COLVIN, Commissioner,
Social Security Administration,

                Defendant.
------------------------------------------------------------X

**MEMORANDUM AND ORDER**
15-CV-2823 (RRM)

ROSLYNN R. MAUSKOPF, United States District Judge.

      Plaintiff Xiomara Y. Morgan brings this action against defendant Carolyn Colvin, Commissioner of the Social Security Administration (the "Commissioner"), pursuant to 42 U.S.C. § 405(g), seeking review of defendant's determination that she is not entitled to disability insurance benefits under Title XVI of the Social Security Act. Morgan and the Commissioner have cross-moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). (Pl.'s Mot. J. Pls. (Doc. No. 16); Def.'s Mot. J. Pls. (Doc. No. 17).) For the reasons set forth below, Morgan's motion is denied and the Commissioner's motion is granted.

## BACKGROUND

### I.    Procedural History

      On October 26, 2010, Morgan applied for Supplemental Security Income, alleging disability due to fibromyalgia and polymyalgia rheumatica. (Admin. R. (Doc. No. 19) at 182, 198.) Morgan first alleged that she became completely disabled on August 16, 2009. (*Id.* at 141.) On July 14, 2011, Morgan's disability claim was denied. (*Id.* at 80.) On October 31, 2011, Morgan requested a hearing before an administrative law judge ("ALJ"). (*Id.* at 86.)

Morgan received a hearing with the Social Security Administration ("SSA") Office of Disability Adjudication and Review in New York, New York. (*Id.* at 55–77.) On March 13, 2013, ALJ Alan B. Berkowitz presided over the hearing where Morgan, who was represented by an attorney, testified. (*Id.*) At the hearing, Morgan amended her alleged onset date of disability to October 1, 2010. (*Id.* at 58.) On April 9, 2013, the ALJ issued a decision that Morgan was not disabled within the meaning of the Social Security Act. (*Id.* at 40–54.) On August 13, 2014, the Appeals Council denied Morgan's request for review. (*Id.* at 6–12.) On May 15, 2015, Morgan filed the instant action against defendant. (Compl. (Doc. No. 1)).

Before the Court are the parties' motions for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). (Pl.'s Mot. J. Pls.; Def's Mot. J. Pls.) Morgan asserts that the Commissioner erred in finding she was not entitled to disability benefits. (Pl.'s Mot. J. Pls. at 8–15.) Defendant argues that the Commissioner correctly found that Morgan was not disabled. (Mem. L. Supp. Def.'s Mot. J. ("Def.'s Mem.") (Doc. No. 18) at 17.)

## II. Administrative Record

### a. Non-Medical Evidence

Morgan was born in 1958. (Admin. R. at 58, 141.) She completed college and earned her degree in biology. (*Id.* at 59–60, 182.) Her past relevant work includes jobs as a pharmaceutical sales representative, secretary, and waitress. (*Id.* at 60–61, 183.) Morgan reports that she stopped working as a waitress on April 1, 2010 because of her conditions, which she specified as fibromyalgia and polymyalgia rheumatica. (*Id.* at 182.)

In a May 14, 2011 Function Report, Morgan stated that her "daily activities ha[d] been limited considerably" due to her conditions. (*Id.* at 189–97.) She reported that she lives alone in an apartment and cares for her personal needs slowly and with difficulty. (*Id.* at 189–91.) She

stated that she prepares quick meals, orders in, or microwaves frozen food. (*Id.* at 190–91.) She reported that she spends time watching television, reading, and crocheting. (*Id.* at 190, 193–94.) She detailed that she has difficulty sleeping, raising her hands up at certain times, shaking her head, lifting heavy packages, and going up stairs. (*Id.* at 190–91.) She stated that she does housework slowly and in "moderation," including sweeping, ironing, and dusting. (*Id.* at 192.)

Morgan reported that she goes outside twice per week and that she is able to go out alone. (*Id.* at 192.) She walks, uses public transportation, and rides in taxis. (*Id.*) She has a driver's license, but does not drive because she does not have a car. (*Id.* at 193.) She does not do much shopping on foot and shops mostly online. (*Id.*) She does not spend time with others, but reported that she has no problems getting along with people and tries to go to church on Sundays. (*Id.* at 194.) Morgan stated that she had difficulty sitting or standing for "too long," bending and lifting, quickly walking or climbing stairs, kneeling, squatting, and lifting her arms. (*Id.* at 194–95.) She has no problems paying attention, remembering things, following spoken and written instructions, and finishing what she started. (*Id.* at 196–97.)

In a September 6, 2011 Disability Report completed in connection with her appeal, Morgan stated that her bodily pain had increased, and her chest cavity felt like it was protruding. (*Id.* at 200.) She stated that it was more difficult to walk up a flight of stairs (she had to take one step at a time), sit for long periods, drive, bend, dress herself, brush her teeth, comb her hair, chew, and open her mouth. (*Id.* at 200, 202–03, 206–07.)

During the March 13, 2013 administrative hearing, Morgan testified that she lives in an apartment on the third floor of a non-elevator building. (*Id.* at 59.) She uses public transportation when necessary, and she took a bus and walked two blocks to the hearing. (*Id.* at 59, 75.) Morgan described her conditions and symptoms, including fibromyalgia, rheumatoid

arthritis, back and neck pain, knee problems, difficulty opening her jaw, and wrist pain. (*Id.* at 61–64, 66–67.) Morgan stated that: she cannot sit for more than 20 minutes of time without low back pain, but she can sit for up to 45 minutes, or up to an hour and a half if she is in a high chair; she has difficulty with lifting, standing, and bending, due primarily to her knees and back; she experiences fatigue; and her "focus point [i]s very low." (*Id.* at 61–62, 72–73.)

Morgan testified that she was not currently in pain, noting that she had taken her medication (Prednisone). (*Id.* at 64, 66.) She had taken prednisone for the prior two years and it helped her symptoms. (*Id.* at 64–65.) She also reported taking ibuprofen and some supplements. (*Id.* at 64, 66, 72.) Morgan sometimes wears a wrist brace, and she takes warm baths to help with pain. (*Id.* at 72.) She stated that she hopes to eventually be able to stop taking Prednisone, due to its potential long-term side effects. (*Id.* at 65.) Morgan stated she was previously "a lot worse" and her condition had improved with medication, but she had still not regained full capacity to do her prior activities. (*Id.* at 76.)

### b. Medical Evidence

#### i. Long Island College Hospital

Days prior to her alleged onset date of October 1, 2010, Morgan presented to the Long Island College Hospital (LICH) emergency department for back pain on September 28, 2010. (*Id.* at 227–46, 414–30.) Morgan complained of diffuse musculoskeletal pain and back pain, which had worsened in the three weeks prior. (*Id.* at 228.) She reported that her pain was worse in the morning and got better with ambulation during the day. (*Id.*) She also reported decreased range of motion in her shoulder and hip joints, which were limited by pain, as well as groin pain and tinging in her fingertips. (*Id.*) She took Advil and Cyclobenzaprine with mild to moderate relief. (*Id.*) Examination revealed range of motion in the upper extremities limited by pain on

4

internal and external rotation, abduction, and adduction. (*Id.* at 228–29.) Diagnoses were arthritis, radiculopathy, and hypertension. (*Id.* at 228, 230, 234–35, 238, 242–43.) Morgan was given a note that she would be out of work for two days. (*Id.* at 235.)

On October 1, 2010, Morgan was referred to the LICH emergency department by her neurologist due to abnormal lab work results, sub-acute multiple joint pain, and low grade fever. (*Id.* at 247–70, 281, 413). Physical exam revealed an antalgic gait and tenderness in shoulders and hips bilaterally, 1/5 strength in the left leg, and 2/5 strength in the right leg. (*Id.* at 248–49.) The diagnosis was myalgia. (*Id.* at 257.) Morgan reported that she was pain-free after taking Percocet and she requested treatment on an outpatient basis. (*Id.*)

An October 13, 2010 magnetic resonance imaging (MRI) of the cervical spine revealed mild degenerative findings without marked canal or foraminal compromise. (*Id.* at 280.) On October 25, 2010, a second MRI of the lumbar spine revealed multilevel degenerative disease in multiple levels, neural foraminal narrowing likely greatest at L3 through S1 levels, and some increased intensity at the dorsal aspect of the L4-L5 disc bulge, which may represent an associated posterior end plate osseous ridge and/or annular tear. (*Id.* at 275–77.)

On June 3, 2011, Morgan presented to LICH for treatment of recent right shoulder and arm pain and left arm swelling and weakness. (*Id.* at 282–96, 376–96.) Examination of the right arm revealed mild diffuse tenderness of the shoulder and marked increase in shoulder pain when trying to lift the arm, but Morgan was able to leave the right arm elevated with good and normal strength. (*Id.* at 378.) The left arm revealed mild swelling and erythema at the biceps and minimal tenderness. (*Id.*) X-rays of the right shoulder were unremarkable, and a deep vein thrombosis (DVT) study of the left arm was negative. (*Id.* at 383–84, 387–88.) The diagnosis was right shoulder joint pain and left arm cellulitis (bacterial infection of the skin). (*Id.* at 388.)

Morgan received intravenous antibiotics and was discharged that day with a prescription for Augmentin and Prednisone. (*Id.* at 284, 292, 379.)

Morgan returned to LICH on November 2, 2011 for evaluation of hypertension, at the referral of the dental clinic, which had planned to remove her wisdom teeth that day. (*Id.* at 353–65.) Examination revealed blood pressure of 186/100. (*Id.* at 353.) Examination findings were otherwise essentially normal, including full (5/5) motor strength in all extremities. (*Id.* at 354–55.) The diagnosis was hypertension and Morgan was given Norvasc. (*Id.* at 355.) August 10, 2012 lab work indicated a negative cyclic citrullinated peptide ("CCP") antibody test and abnormal rheumatoid factor and CRP. (*Id.* at 458–60.)

### ii. Martin Feldman, M.D. – Treating Physician

On October 4, 2010, Morgan first presented to Dr. Feldman for treatment. (*Id.* at 447.) She returned on October 18, 2010, complaining of pain throughout her body, with fever, chills, and muscle stiffness. (*Id.* at 321.) On April 4, 2011, Morgan returned to Dr. Feldman with complaints of chronic pain in her back, neck, buttocks, groin, and shoulders. (*Id.* at 320.) She reported pain when coughing or sneezing and trouble sleeping. (*Id.* at 32.) Morgan again saw Dr. Feldman on May 26, 2011 with similar complaints. (*Id.* at 319.) She reported shoulder pain (left more than right) and neck, groin, and rib pain. (*Id.*)

On March 6, 2012, Morgan presented to Dr. Feldman complaining of hip, jaw, and body pain. (*Id.* at 315–16.) She stated that going up and down a flight of stairs was difficult. (*Id.* at 315.) She listed her medications, Prednisone and ibuprofen as needed, and stated that her pain was worse by 40% when she did not take Prednisone. (*Id.* at 315–16.) Morgan returned to Dr. Feldman on August 11 and September 1, 2011, with similar complaints of jaw and body pain. (*Id.* at 317–18.)

On March 6, 2012, Dr. Feldman completed a form report at the request of the ALJ. (*Id.* at 447–53.) Dr. Feldman stated that he saw Morgan every few months and had last seen her that day. (*Id.* at 447.) He listed a diagnosis of rheumatoid arthritis and noted that Morgan's current symptoms were severe pain most prominent in hips and muscle stiffness in upper arms and jaw. (*Id.*) He noted that Prednisone and ibuprofen were prescribed by another physician, which provided mild relief. (*Id.* at 448.) He noted that on examination, Morgan could not arise from squatting position, but she was able to tandem walk unaided and walk on heels and toes. (*Id.* at 449.) He also noted a waddling gait. (*Id.*) Morgan did not require an assistive device to walk. (*Id.*) He stated that grip strength was abnormal (described as "opening a jar is difficult"). (*Id.*) Sensory examination revealed abnormal joint position, though otherwise normal. (*Id.* at 450.) There were no notable abnormalities in mental status. (*Id.*) Dr. Feldman opined that Morgan's physical activity was limited by joint pain. (*Id.* at 451.) He reported that Morgan could occasionally lift and carry ten pounds, stand and/or walk for less than two hours in a day, and sit for less than six hours in a day. (*Id.* at 452.) He stated that Morgan's ability to push and/or pull was limited, but did not describe that limitation. (*Id.*)

In a March 8, 2012 letter, Dr. Feldman stated that he was Morgan's primary care provider and had most recently examined her on March 6, 2012. (*Id.* at 322–23.) He stated that, currently, his history revealed that Morgan was unable to lift more than five pounds, she could not sit or stand for more than one hour at a time, she could not walk twenty yards without significant pain, she had difficulty rising from a squatting position, and she required at least three attempts to push or pull open doors. (*Id.* at 322.) Morgan was unable to concentrate on simple mental tasks due to pain. (*Id.*) She could not raise her arms or bend to pick up items off of the floor, and she had difficulty climbing stairs. (*Id.*) Dr. Feldman opined that, due to these and

7

other issues, Morgan was "100% incapable of working in any capacity." (*Id.*)  He stated that Morgan had been consulting for two years with rheumatologist Dr. Daniel Ricciardi, who had confirmed the diagnosis of rheumatoid arthritis based on laboratory analysis. (*Id.* at 322–23.) Dr. Feldman also stated that he had reviewed that data and concurred with the diagnosis. (*Id.* at 323.)  He opined that the disease was lifelong. (*Id.*)

Dr. Feldman enclosed a "review of [Morgan's] disability specifics from May 26, 2011." (*Id.* at 324.)  He also enclosed laboratory data and an initial entry history from October 4, 2010. (*Id.*)  In his "Info for Disability forms May 26, 2011," Dr. Feldman listed rheumatoid arthritis symptoms, medications of Prednisone and Motrin (and Percocet tried the previous year), and a very guarded prognosis. (*Id.* at 325.)  He listed examination findings of motor strength of 3/5 in the right arm and 5/5 in the left arm; Morgan did not require an assistive device to walk; she could not rise from the squatting position without assistance; grip demonstrated a marked change from previously normal; vision and senses were normal; and there was no obvious trouble with mental status or communication. (*Id.*)  He noted that April 21, 2011 blood work showed elevation of C-reactive protein ("CRP"), mild anemia, and abnormality of protein electrophoresis. (*Id.*)  He stated that Morgan's inability to lift, physical fatigue, mental fatigue, and muscle fatigue, were all related to severely diminished energy and her autoimmune condition, rheumatoid arthritis. (*Id.*)

### iii. Daniel Ricciardi, M.D. – Treating Rheumatologist

On October 25, 2010, Morgan first presented to Dr. Ricciardi for treatment. (*Id.* at 278.) On examination, Dr. Ricciardi noted that Morgan had difficulty ambulating, decreased range of motion of the cervical spine and bilateral shoulders, 3/5 strength in the upper and lower extremities bilaterally, and pain with light palpation of the cervical and lumbar spine and biceps.

(*Id.* at 278–79.)  Dr. Ricciardi's assessments included probable rheumatoid arthritis, polyarthritis, and questionable fibromyalgia.  (*Id.* at 279.)  Morgan was prescribed Prednisone and Amrix, as well as follow-up lab work.  (*Id.*)

Morgan returned for her rheumatology follow-up on November 1, 2010.  (*Id.* at 272.)  She reported some improvement since taking Prednisone.  (*Id.*)  Examination revealed low back and upper extremity muscle tenderness, as well as decreased range of motion of the lumbar spine.  (*Id.*)  The assessment was questionable fibromyalgia and Morgan was continued on Prednisone.  (*Id.*)  During a February 15, 2011 follow-up, Dr. Ricciardi diagnosed rheumatoid arthritis.  (*Id.* at 271.)

On March 4, 2013, Dr. Ricciardi completed a Rheumatoid Arthritis Impairment Questionnaire.  (*Id.* at 461–67.)  He listed a diagnosis of rheumatoid arthritis, with a fair prognosis.  (*Id.* at 461.)  He opined that, in an eight-hour workday, Morgan would have a "moderate" limitation (defined as significantly limited but not completely precluded) in using her fingers/hands for fine manipulation, and a "minimal" limitation for grasping, turning, and twisting objects, and using arms for reaching, including overhead.  (*Id.* at 462.)  He listed positive clinical findings including reduced range of motion at the hips; trigger points; reduced grip strength in the hands; swelling at the wrists; and tenderness at the wrists, metacarpophalangeal (MCP), and proximal interphalangeal (PIP) joints.  (*Id.* at 462–63.)  He noted laboratory test results indicating positive rheumatoid and erythrocyte sedimentation rate ("ESR") results.  (*Id.* at 463.)  He stated that Morgan's symptoms and functional limitations were reasonably consistent with her impairments.  (*Id.*)

Dr. Ricciardi also noted that there were multiple precipitating factors leading to pain, including stress and changes in temperature.  (*Id.* at 464.)  Dr. Ricciardi opined that, in an eight-

9

hour day, Morgan could sit for four hours, stand/walk for one hour, and lift and carry up to twenty pounds occasionally. (*Id.* at 464–65.) He indicated that it was necessary or medically recommended that Morgan not sit continuously and must often get up and move around for five to ten minutes. (*Id.*) He further opined that Morgan's pain, fatigue, or other symptoms would frequently interfere with her attention and concentration, and stress contributed to the severity of her symptoms and limitations. (*Id.* at 465–66.) He stated that she could tolerate "low stress," she would need to take one to two fifteen minute breaks to rest or relieve pain at unpredictable intervals, and she would be absent about two to three times per month. (*Id.* at 466.) He also indicated other limitations including psychological limitations; no pushing, pulling, or kneeling; and a need to avoid wetness, temperature extremes, humidity, gases, and heights. (*Id.* at 466–67.) He opined that the earliest date that his description of symptoms and limitations applied was October 25, 2010. (*Id.* at 467.)

### iv. Vinod Thukral, M.D. – Consultative Examiner

On July 6, 2011, Morgan presented to Dr. Vinod Thukral for a consultative internal medicine examination. (*Id.* at 297–300.) Morgan complained of sharp, intermittent body pain precipitated by bending, lifting, pulling, and pushing. (*Id.* at 297.) Morgan admitted to some neck and back pain relief with rest and pain medication. (*Id.*) She listed her current medications as Prednisone, Motrin, calcium, and vitamin D. (*Id.* at 297–98.) Morgan reported that she lived alone and showered, bathed, and dressed herself daily. (*Id.* at 298.) She stated that she could not cook, clean, do laundry, or shop due to neck and lower back pain. (*Id.*)

On examination, Morgan appeared to be in no acute distress and Dr. Thukral noted no abnormalities. (*Id.*) Dr. Thukral diagnosed neck pain and lower backache by history; possible rheumatoid arthritis (pending workups) by history; and possible fibromyalgia by history. (*Id.* at

299–300.) Dr. Thukral opined that Morgan had no limitations for sitting or standing, but had mild limitations for pulling, pushing, or any other such-related activities due to neck pain and lower backache. (*Id.* at 300.)

### v. Gregory McCormack, M.D. – Consultative Record Review

On May 10, 2012, medical consultant and rheumatologist Dr. Gregory McCormack reviewed Morgan's file and completed a case analysis and Physical Residual Functional Capacity Assessment form. (*Id.* at 328–36.) Dr. McCormack noted that the medical evidence showed a diagnosis of rheumatoid arthritis with an elevated ESR and CRP and with a mildly elevated CCP. (*Id.* at 328.) Dr. McCormack also noted Morgan's complaints of low back pain, the MRI evidence of multilevel degenerative disc disease of the lumbar spine, and the MRI evidence of mild degenerative changes of the cervical spine. (*Id.*)

Dr. McCormack opined that the combined effect of the degenerative joint/disc disease of the cervical and lumbar spines was that of a severe impairment, and given Morgan's diffuse joint/muscle pain, a presumptive diagnosis of fibromyalgia was also severe. (*Id.*) Dr. McCormack further opined that Morgan retained the capacity to lift and carry twenty pounds occasionally and ten pounds frequently, stand and/or walk for a total of about six hours in an eight-hour workday, and sit for a total of about six hours in an eight-hour workday. (*Id.* at 330.)

### vi. Theodore Fields, M.D. – Examining Rheumatologist

Roughly seven months after the ALJ found that Morgan was not entitled to disability benefits, Morgan presented to Dr. Fields for a rheumatology examination. (*Id.* at 13–21.) On October 23, 2013, Dr. Fields examined Morgan, reviewed her medical treatment notes and blood test results completed between 2010 and 2011, and filled out a Multiple Impairment Questionnaire form.

At the appointment, Morgan described problems with her gait and pain in her knees, low back, groin, neck, jaw, and left wrist. (*Id.* at 21.) Examination revealed tenderness of the cervical spine, pain with side bending in both directions and with extension of the spine, decreased internal rotation of the shoulders and some pain with internal rotation bilaterally, swelling and tenderness in the left first and third finger joints at the MCP joint, significant groin pain with motion in the left hip, swelling, tenderness, and marked crepitus in both knees, and tenderness of the trapezius and sternocleidomastoid muscles bilaterally. (*Id.*) Dr. Fields diagnosed likely osteoarthritis of the knees and left hip, likely cervical disc disease, lumbar disc disease, and likely rheumatoid arthritis. (*Id.* at 23.) He opined that her condition was expected to last at least twelve months and was already present at the level described since 2009. (*Id.* at 19, 23.)

Based on his examination findings and review of the record and testing, Dr. Fields agreed with Dr. Ricciardi's findings and opined that Morgan was able to sit four hours total and stand/walk one hour total in an eight hour workday on a regular basis. (*Id.* at 15.) When sitting, she needed to get up and move around every thirty minutes and could not sit again for ten minutes. (*Id.* at 15–16.) Morgan had significant limitations performing repetitive handling, reaching, fingering, and lifting due to hand arthritis. (*Id.* at 16.) She was moderately limited from using her arms/hands for reaching and using the left arm for grasping, turning, and twisting objects, as well as fine manipulations. (*Id.* at 16–17.) Dr. Fields assessed that Morgan's pain, fatigue, or other symptoms were constantly severe enough to interfere with her attention and concentration. (*Id.* at 18.) Morgan had good days and bad days. (*Id.* at 19.) Dr. Fields estimated that she would miss work more than three times a month due to her impairments or treatment. (*Id.*) Records from this visit were sent to the Appeals Council. (*Id.* at 13–21.)

## STANDARD OF REVIEW

### I. Review of Denial of Social Security Benefits

The Court does not make an independent determination about whether a claimant is disabled when reviewing the final determination of the Commissioner. *See Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). Rather, the Court "may set aside the Commissioner's determination that a claimant is not disabled only if the [ALJ's] factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000) (quoting 42 U.S.C. § 405(g)). "'[S]ubstantial evidence' is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

"In determining whether the agency's findings were supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Id.* (internal quotation marks omitted). "If there is substantial evidence in the record to support the Commissioner's factual findings, they are conclusive and must be upheld." *Stemmerman v. Colvin*, No. 13-CV-241 (SLT), 2014 WL 4161964, at *6 (E.D.N.Y. Aug. 19, 2014) (citing 42 U.S.C. § 405(g)). "This deferential standard of review does not apply, however, to the ALJ's legal conclusions." *Hilsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330, 342 (E.D.N.Y. 2010). Rather, "[w]here an error of law has been made that might have affected the disposition of the case, [an ALJ's] failure to apply the correct legal standards is grounds for reversal." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (internal quotation marks omitted).

## II. Eligibility for Disability Benefits

To qualify for disability insurance benefits, an individual must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(2)(A). This requires a five-step analysis for determining whether a claimant is disabled:

> [1] First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity.
>
> [2] If he is not, the Commissioner next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.
>
> [3] If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider him *per se* disabled.
>
> [4] Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.
>
> [5] Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (quoting *DeChirico v. Callahan*, 134 F.3d 1177, 1179–80 (2d Cir. 1998)); *see also* 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proof for the first four steps of the analysis, but the burden shifts to the Commissioner for the fifth step. *See Talavera*, 697 F.3d at 151.

## DISCUSSION

In support of her motion for judgment on the pleadings, Morgan argues that (1) the ALJ failed to follow the treating physician rule, (2) the ALJ failed to properly evaluate Morgan's

credibility, and (3) the Appeals Council failed to consider new and material evidence. (Pl.'s Mot. J. Pls. at 8, 13, 15.) The Commissioner argues that the ALJ properly determined that Morgan was not disabled. (Def.'s Mem. at 19–26.)

I.      **The ALJ's Determination**

Here, the ALJ properly engaged in the five-step analytical framework outlined above. In steps one through three, the ALJ found that Morgan had the severe impairments of fibromyalgia, rheumatoid arthritis, and multilevel degenerative disc disease (spondylosis), which individually or in combination did not meet or equal a listed impairment. (Admin. R. at 45–46.) The ALJ then assessed Morgan's residual functional capacity ("RFC") and determined that Morgan could perform light work, could understand complex instructions and complete complex tasks, but was limited to only occasional squatting, bending, stooping, crouching, and crawling. (*Id.* at 46–48.) At step four, the ALJ determined Morgan could not perform her past relevant work based on her RFC. (*Id.* at 49.) At step five, the ALJ found that Morgan was not disabled because she could perform jobs existing in significant numbers in the national economy. (*Id.*)

The ALJ's findings at each step are supported by substantial evidence. Specifically, Morgan contests the ALJ's RCF findings. However, the ALJ's RFC finding is supported by Morgan's treatment records, as well as the opinions of Dr. Thukral and Dr. McCormack. Treatment notes from Dr. Ricciardi evidence his assessment that Morgan could tolerate low stress work. Dr. McCormack made similar findings. For example, Dr. McCormack, like Dr. Ricciardi, assessed that Morgan was capable of working and could lift up to 20 pounds. Though Dr. McCormack did not have treatment notes from Dr. Ricciardi's and Dr. Feldman's most recent assessments, his opinion is nonetheless generally consistent with Morgan's treatment

15

notes.[1] *See Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) ("Although the ALJ's conclusion may not perfectly correspond with any of the opinions of medical sources cited in his decision, he was entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole."). Morgan's more specific arguments to the ALJ's findings in connection with the RFC determination – that the ALJ improperly accorded limited weight to the opinions of her treating physicians and that the ALJ erred in assessing her credibility – are assessed below.

### a. The Treating Physician Rule

The regulations controlling an ALJ's credibility determination provide criteria that the ALJ must consider in assigning credibility to a medical assessment:

> Generally, [the ALJ] give[s] more weight to opinions from [a claimant's] treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. § 404.1527(c)(2). The treating physician's opinion on the nature and severity of the patient's impairment is generally given controlling weight if it is supported by "medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." *Id.*

Where the ALJ assigns less than controlling weight to the treating physician's opinion, he is required to provide "good reasons" for doing so. *Id.* ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."); *see also Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir. 1993) (upholding these regulations as valid

---

[1] There were, of course, some inconsistencies between Dr. McCormack's assessment and Morgan's treatment notes, as well as internal inconsistencies within the treatment notes themselves. Such inconsistencies are addressed in the subsection below.

16

and binding on the courts). In deciding how much weight to give the opinion, the ALJ must consider "(i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (citing 20 C.F.R. § 404.1527(d)(2)). However, "an ALJ does not have to state on the record every reason justifying a decision." *Brault v. Comm'r of Soc. Sec.*, 683 F.3d 443, 448 (2d Cir. 2012).

Here, the ALJ properly gave limited weight to the opinions of Dr. Feldman and Dr. Ricciardi – Morgan's treating primary care physician and rheumatologist, respectively – and provided good reasons for doing so. Though both physicians had treated Morgan since 2010 and Dr. Ricciardi was a specialist, the ALJ explained that he gave the two opinions limited weight "as they are not fully supported by [Morgan]'s testimony and the records and opinions in evidence, nor are they entirely consistent with each other." (Admin. R. at 48.) He noted the stark differences between Dr. Feldman's March 6, 2012 assessment and his March 8, 2012 assessment. Where Dr. Feldman had initially found Morgan to be capable of lifting ten pounds and walking for two hours, just two days later he found she could not lift more than five pounds or walk for more than twenty yards. He also noted the inconsistencies between Dr. Feldman's and Dr. Ricciardi's assessments. Dr. Feldman had described Morgan's gait as "waddling," whereas Dr. Ricciardi found that Morgan had a normal gait. In further contrast to Dr. Feldman's opinion, on March 4, 2013, Dr. Ricciardi opined that Morgan could lift up to twenty pounds and had no pain, inflammation, or limitation of movement in her back, neck, ankles, or feet. Most

notably, Dr. Feldman opined that Morgan was completely unable to work, while Dr. Ricciardi and all other examiners found that she was capable of at least low stress work.

Given these conflicts, as well as the conflicting evidence of Morgan's activities of daily living, the ALJ properly weighed and resolved the conflicts in the record. *See Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) ("Genuine conflicts in the medical evidence are for the Commissioner to resolve.").

### b. The ALJ's Credibility Finding

In formulating Morgan's RFC, the ALJ properly considered Morgan's testimony and other record evidence regarding her limitations. It is within the ALJ's discretion to "evaluate the credibility of a claimant and to arrive at an independent judgment, in light of medical findings and other evidence," regarding the true extent of a claimant's alleged symptoms. *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979). Where the ALJ rejects a plaintiff's testimony in light of objective medical evidence and other relevant factors, he must explain that decision "with sufficient specificity to enable the [reviewing] Court to decide whether there are legitimate reasons for the ALJ's disbelief" and whether his decision is supported by substantial evidence. *Calzada v. Astrue*, 753 F. Supp. 2d 250, 280 (S.D.N.Y. 2010) (quoting *Fox v. Astrue*, No. 6:05-CV-1599 (NAM), 2008 WL 828078, at *12 (N.D.N.Y. Mar. 26, 2008)).

Here, substantial evidence supports the ALJ's finding that although Morgan's "medically determinable impairments could reasonably be expected to cause the alleged symptoms . . . [her] statements concerning the intensity, persistence and limiting effects of these symptoms [we]re not entirely credible . . . ." (Admin. R. at 47.) In making this finding, the ALJ considered Morgan's testimony that her condition had improved from the time of her application, that her Prednisone dosage had been cut in half, that she is able to live in a third floor walk-up, and that

18

she was able to take public transportation and walk two blocks to arrive at the hearing where she was not in pain. Quite simply, Morgan's testimony and activities of daily living contradicted her allegations of disabling pain and supported a finding that she retained the ability to perform light work. As such, the substantial evidence supports the ALJ's credibility finding.

## II.    New Evidence Submitted to the Appeals Council

The regulations direct the Appeals Council to consider "new and material evidence only where it relates to the period on or before the date of the administrative law judge hearing decision." 20 C.F.R. § 404.970(b). "Evidence is 'new' if it was not considered by the ALJ and is 'not merely cumulative of what is already in the record,' and it is 'material' if it 'is both relevant to the claimant's condition during the time period for which benefits were denied and probative.'" *Sistrunk v. Colvin*, No. 14-CV-3208 (JG), 2015 WL 403207, at *7 (E.D.N.Y. Jan. 28, 2015) (quoting *Jones v. Sullivan*, 949 F.2d 57, 60 (2d Cir. 1991)). "Materiality also requires 'a reasonable possibility that the new evidence would have influenced the [Commissioner] to decide the claimant's application differently.'" *Id.* (quoting *Jones*, 949 F.2d at 60).

After the ALJ issued his determination, Morgan submitted records from an examination and record review conducted by Dr. Fields. The Appeals Council reviewed Dr. Field's October 13, 2013 report and found that it did not affect the ALJ's April 9, 2013 determination. Though Dr. Fields stated that Morgan's condition was present at the level described since 2009, he based that opinion on evidence already in the record – Morgan's treatment notes and testing from the relevant period. Moreover, his single examination conducted months after the ALJ's decision

did not provide a basis for the ALJ to issue a contrary decision. Accordingly, the Appeals Council did not err in finding that the new evidence did not warrant remand.

## CONCLUSION

For the reasons herein, Morgan's motion for judgment on the pleadings is denied and the Commissioner's motion for judgment on the pleadings is granted. The Clerk of Court is respectfully directed to enter judgment accordingly and close this case.

SO ORDERED.

*Roslynn R. Mauskopf*

Dated: Brooklyn, New York
       September 28, 2016

_____
ROSLYNN R. MAUSKOPF
United States District Judge